IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                  No. 20 CR 01777 MV

DAKOTA BRISCOE,

      Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Defendant's Motion to Suppress [Doc. 96]. The Court, having considered the Motion, briefs, and relevant law, and being otherwise fully informed, finds that the Motion is not well-taken and will be **DENIED.**

## BACKGROUND

Mr. Briscoe was charged in a nine-count Superseding Indictment with, *inter alia*, being a Felon in Possession of a Firearm and Ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924. Doc. 84. This opinion addresses the issues of whether an agent with United States Border Patrol ("USBP") violated Mr. Briscoe's Fourth Amendment rights when he detained Mr. Briscoe at a checkpoint on September 16, 2020, and whether, after Mr. Briscoe was later arrested, the USBP agent and a New Mexico state police officer violated his *Miranda* rights. The following represents the Court's findings of fact, based on the evidence submitted by the parties and the testimony presented at the hearing held on September 18, 2023.

Around 1:00 p.m. on September 16, 2020, Mr. Briscoe drove through a USBP checkpoint in Las Cruces, New Mexico. Doc. 111 at 1; Rough Hearing Transcript[1] ("H'rg Tr.") at 84:6. He

---

[1] The Court's citations to the transcript refer to the court reporter's original, unedited version; any final transcripts may contain slightly different page and/or line numbers.

was driving a white commercial style van with reflective stripes. *Id.*; H'rg Tr. At 88:9–12. USBP Agent Jose Escajeda made contact with Mr. Briscoe at the primary checkpoint area. *Id.* Before Agent Escajeda asked anything, he observed that Mr. Briscoe was "shifting in his seat a lot" and "looking everywhere as if he was nervous about something or being cautious about something." H'rg Tr. at 71:1–4. Agent Escajeda asked him about his citizenship status and Mr. Briscoe said he was a United States citizen. *Id.* at 71:5–6.

Agent Escajeda testified that he then requested to see the inside of the van and that Mr. Briscoe nodded his head yes. *Id.* at 98:5–15. He noticed Mr. Briscoe fidgeting with the buttons on the door "as if he didn't know how to open the vehicle." *Id.* at 72:16–19. He then walked to the rear of the van and noticed that there was no license plate or temporary tag anywhere on the vehicle. *Id.* 72:19–23. At that point, Agent Escajeda asked who the owner of the vehicle was, and Mr. Briscoe stated that he had recently bought it from someone named Jose Sullivan. *Id.* 73:8–9, 73:14–16. Due to the reflective markings on the van, he also asked if the van was a work vehicle. *Id.* at 92:8–14. During this questioning, Agent Escajeda observed that Mr. Briscoe was still exhibiting nervous behavior and did not make eye contact with him. *Id.* at 73:10–12. Agent Escajeda asked for identification and Mr. Briscoe rifled through his bag as if searching for an identification but ultimately did not provide one. *Id.* at 73:15–16; 75:10–15. He testified that "it kind of raised my suspicion whether [Mr. Briscoe] knew it or not if he had an identification." *Id.* at 75:15–16.

Agent Escajeda also testified that, while at the primary area, he noticed that Mr. Briscoe's tattoos were "really fresh and his eyebrows were recently tattooed." *Id.* at 74:5–6. He further testified that as a border patrol agent, he had received minimal training, primarily literature, on how to recognize gang tattoos. *Id.* at 74:12–14. One of the tattoos that stood out to Agent Escajeda was the "1706" tattoo on Mr. Briscoe's face, which he recalled as being related to Albuquerque

gang members. *Id.* at 74:14–19. He was not sure to which specific gang the tattoo referred. *Id.* Because the tattoos on his eyebrows looked like "they were masking something under it," Agent Escajeda believed that Mr. Briscoe was possibly hiding his identity. *Id.* at 74:21–22, 74:25. He also testified that as part of the literature on recognizing tattoos, he had read that people use tattoos to hide their identity or gang associations. *Id.* at 75:1–6.

After Mr. Briscoe failed to provide identification, Agent Escajeda referred him to the secondary inspection area. H'rg Tr. at 75:19–20. Agent Escajeda estimated that his interaction with Mr. Briscoe at the primary checkpoint area lasted about two or three minutes. *Id.* at 88:4–5. In his testimony, Agent Escajeda stated that he referred Mr. Briscoe to the secondary area due to Mr. Briscoe's nervous behavior, his seeming lack of knowledge as to whether he had identification, his tattoos, and the absence of tags on the van. *Id.* at 75:15–20. Agent Escajeda testified that before he sent Mr. Briscoe to the secondary inspection area, he asked Mr. Briscoe to consent to a canine sniff, which he believed Mr. Briscoe gave.[2] *Id.* at 75:24–76:2.

Once Agent Escajeda directed Mr. Briscoe to pull into the secondary area, he alerted the rest of the agents at the checkpoint, who then came out to assist him. *Id.* 76:4–6. At that point, the canine handler was inside the checkpoint office. *Id.* at 76:9–15. It then took Agent Escajeda about one minute to walk to the secondary area. *Id.* 88:18–19. When Agent Escajeda arrived at the secondary area, Mr. Briscoe was outside of the van. *Id.* 76:21–22. Agent Escajeda testified that "one of the things that stood out was it appeared [Mr. Briscoe] had urinated his pants." *Id.* 77:3–4. Agent Escajeda testified that they were only at the secondary area for a brief time and no additional questions were asked of Mr. Briscoe at the secondary area. *Id.* at 90:5–15.

Agent Escajeda then escorted Mr. Briscoe into the checkpoint office to verify his

---

[2] Mr. Briscoe asserts in his motion that he did not consent to the canine sniff. Doc. 115 at 5.

identity. *Id.* at 77:25–78:3. At the checkpoint office, Agent Escajeda had Mr. Briscoe wait in a room where he provided the name, date of birth, and social security number for "Austin Epps." H'rg Tr. at 78:18–23, 91:23–25.[3] When Agent Escajeda fed that information into the computer, it showed that the date of birth and social security number did in fact belong to "Austin Epps" and that "Austin Epps" had an active warrant out of Valencia County for failure to appear. *Id.* at 79:1–5. The records check showed that "Austin Epps" was not a convicted felon. *Id.* at 79:6–8. Agent Escajeda testified that the process of checking Mr. Briscoe's identification "might have taken anywhere from approximately five to 10 minutes." *Id.* at 92:15–18.

While Agent Escajeda verified Mr. Briscoe's information, the canine handler conducted a canine sniff, and another agent ran the VIN on the van. *Id.* at 79:10–16.[4] The VIN search showed that the van was not stolen, but the name did not match the name that Mr. Briscoe had provided. *Id.* at 79:19–21. Agent Escajeda could not recall the name that came up on the VIN search but remembered that it was a female name. *Id.* at 79:23. When confronted with this discrepancy, Mr. Briscoe said he "wasn't too sure" why it was a different name than the person he bought it from and did not recognize the name of the person that Agent Escajeda told him. *Id.* at 79:24–80:8.

Agent Escajeda also testified that, while he was verifying Mr. Briscoe's information, the canine handler advised that the canine positively alerted to the van. *Id.* at 91:7–8. As a result of the positive alert, the handler searched the van and found a handgun. *Id.* at 80:16–21. At this point, Agent Escajeda had discovered the warrant for "Austin Epps" and had informed Mr. Briscoe that he was under arrest. *Id.* at 79:1–5. Agent Escajeda asked who owned the gun and Mr. Briscoe said

---

[3] When asked by the Court to describe the room, Agent Escajeda clarified that it is an area, separate from the agents' work area, designated for individuals subject to questioning. Once in the room, individuals can request to leave or wait by their vehicles. H'rg Tr. 97:1-11.
[4] Agent Escajeda testified that the process of checking a VIN could last anywhere from one to five minutes. H'rg Tr. 96:9-14. He also testified that the search of the car and VIN did not delay his questioning inside the office. *Id.* at 98:25–99:2.

it belonged to him. *Id.* at 80:25–81:3. Agent Escajeda ran the firearm through the computer system and it did not come back as stolen. *Id.* 82:5-8. He testified that because he believed Mr. Briscoe to be Austin Epps, and because Austin Epps was not a convicted felon barred from owning a gun, the van and the gun were designated as Mr. Briscoe's personal property to be turned over to the state police. *Id.* at 81:4–12, 82:9–11. In his testimony, Agent Escajeda said that the purpose of asking about the gun "was mainly just to know […] how we were gonna deal with the personal property in his possession." *Id.* at 83:16–17. At 1:46 p.m., Agent Escajeda called the New Mexico central dispatch to have someone pick Mr. Briscoe up on the failure to appear warrant. *Id.* at 93:25–94:1.

Officer Tommy Vigil of the New Mexico State Police responded to Agent Escajeda's call. H'rg Tr. at 104:18–23. When he arrived at the checkpoint, agents informed him that he was to pick up "Austin Epps" on a warrant. *Id.* at 105:3–5. Officer Vigil asked Mr. Briscoe about the gun. *Id.* at 105:14–20. Officer Vigil testified that in response to his question about the gun, Mr. Briscoe said, "yeah that's my gun" and that his girlfriend had given it to him. *Id.* at 105:19–21. Officer Vigil informed Mr. Briscoe that he could not take it to jail with him and that Officer Vigil was going to keep it "for safekeeping." *Id.* at 105:23–25. Officer Vigil testified that he intended to keep the gun as Mr. Briscoe's "personal property," which Mr. Briscoe could retrieve once he got out of jail. *Id.* at 106:16–20. During this interaction, Officer Vigil was under the impression that Mr. Briscoe was "Austin Epps." He did not find out until the next day that he was in fact Dakota Briscoe and had a felony warrant for his arrest. *Id.* at 110:1–6. Upon receipt of this information, the gun's classification was changed from "personal property" to "evidence." *Id.* at 110:14–16.

5

**DISCUSSION**

On January 16, 2023, Mr. Briscoe filed the instant Motion to Suppress, asking the Court to suppress both the firearm recovered from the search of his van and the statements that he made to Agent Escajeda and Officer Vigil regarding his ownership of the firearm.  In support of that request, Mr. Briscoe argues first that his detention exceeded the scope of a routine checkpoint in violation of his Fourth Amendment rights, and second that his statements were elicited during a custodial interrogation without proper *Miranda* warnings in violation of his Fifth Amendment rights. Doc. 96 at 4.  The government filed a response on June 23, 2023, disagreeing with both of Mr. Briscoe's arguments. Doc. 115. On September 18, 2023, this Court held an evidentiary hearing, during which it heard testimony from Agent Escajeda and Officer Vigil. At the conclusion of the hearing, the Court took Mr. Briscoe's motion under advisement. For the reasons set forth herein, the Court finds that neither suppression of the firearm nor suppression of Mr. Briscoe's statements is warranted and, accordingly, his Motion to Suppress must be denied in its entirety.

I.      **Suppression of the firearm is not warranted because agents did not exceed the permissible scope of a stop at a fixed border checkpoint.**

In support of his request that the Court suppress the firearm, Mr. Briscoe argues that Agent Escajeda's questions about whether his vehicle was used for work "constituted a line of questioning that went beyond routine topics one might expect at a checkpoint," were "unnecessary," and were not reasonably related to the agent's duty to prevent unauthorized contraband from passing through. Doc. 96 at 2 (citing *United States v. Rascon-Ortiz,* 994 F.2d 749, 752 (10th Cir. 1993)). The defense claims that the reflective markings on the van, combined with a hunch that the van was used for work, do not constitute suspicious circumstances that warranted further questioning. *Id.* To find that such circumstances were suspicious, the defense argues, would

6

be to treat all work vehicles as suspicious and subject such vehicles to more than a routine checkpoint inquiry. *Id.* at 4. In addition to suspicions about the use of the vehicle, the defense argues that Mr. Briscoe's lack of eye contact, fidgeting, and the apparently "new" tattoos on his face did not justify the extension of the stop. *Id.* Lastly, the defense argues that "being physically escorted by an agent to a separate holding area is far more intrusive than routine questions about identity." Doc. 115 at 6. As a result, the defense concludes that, at this point in the encounter, the agents needed, but did not have, reasonable suspicion to detain Mr. Briscoe. *Id.* However, this argument misapprehends the relevant law.

Under *United States v. Martinez–Fuerte,* at a fixed checkpoint, border patrol agents may stop, briefly detain, and question individuals without any individualized suspicion that the individuals are engaged in criminal activity. 428 U.S. 543, 562 (1976). Border patrol agents have "virtually unlimited discretion to refer cars to the secondary inspection area." *United States v. Sanders,* 937 F.2d 1495, 1499 (10th Cir. 1991); *see also United States v. Ludlow,* 992 F.2d 260, 263–64 (10th Cir. 1993) ("[A] routine checkpoint inquiry may properly take place at a primary inspection area, a secondary inspection area, or both as long as the scope of the inquiry is appropriate."). The Fourth Amendment requires that routine checkpoint stops be brief and unintrusive. *Rascon–Ortiz,* 994. F2d at 752. A routine checkpoint stop involves:

> questions concerning the motorist's citizenship or immigration status, and a request for documentation. A cursory visual inspection of the vehicle is also routine, and a few brief questions concerning such things as vehicle ownership, cargo, destination, and travel plans may be appropriate if reasonably related to the agent's duty to prevent the unauthorized entry of individuals into this country and prevent the smuggling of contraband.

*Id.* (internal citations omitted). Further, during a routine fixed checkpoint stop, consent is not required for a canine sniff. *United States v. Chavira,* 9 F.3d 880, 890 n.1 (10th Cir. 1993). Once the canine positively alerts, the agent has probable cause to conduct a search. *Id.* at 890.

If, during its initial routine questioning, an agent observes "suspicious circumstances," the agent also may "briefly question the motorist concerning those suspicions and ask the motorist to explain." *United States v. Massie,* 65 F.3d 843, 848 (10th Cir. 1995) (citation omitted). A suspicious circumstance is not equivalent to the reasonable suspicion standard and there is no single or narrow definition of a suspicious circumstance. *Id.* In construing what "suspicious circumstances" means:

> some deference is properly given to border patrol agents who, as law enforcement officers, are specifically trained to look for indicia of crime, with an emphasis on immigration and customs laws. So long as their interrogation bears a reasonable relationship to their unique duties, the judiciary is properly reluctant to interfere, and a reviewing court should only determine whether the suspicious circumstances as perceived by the border patrol agent are supported by the facts.

*Id.* (citation omitted). The court applies a "common sense view of the totality of the circumstances" to determine whether suspicious circumstances exist. *Id.* (citation omitted). Accordingly, "during a routine fixed checkpoint stop a border patrol agent may ask questions reasonably related to his duties and explore suspicious circumstances but must be brief and unintrusive." *Id.* Agents are limited, however, by the Fourth Amendment "in one important respect—the overall detention cannot exceed a routine checkpoint stop if probable cause, consent or reasonable suspicion does not exist." *Rascon–Ortiz,* 994 F.2d at 753

Applying these principles, in *Massie,* the Tenth Circuit found the following evidence sufficient to support the agents' determination that suspicious circumstances existed: the defendant and his co–defendant gave conflicting answers as to where they had come from; the defendant appeared nervous because he would not make eye contact with the agent and was speaking in a loud voice; the defendant and his co–defendant could not agree on whom they had been visiting; the co–defendant produced identification that the agent found suspect; and the defendant and his co–defendant gave conflicting answers when asked what was in the trunk of the car. 65 F.3d at

849. In addition, the Tenth Circuit concluded that the agents' continued detention and questioning of the defendant did not exceed the confines of a routine checkpoint stop, because the questioning lasted around 8 to 11 minutes from the time the defendants were initially stopped to the moment the dog alerted on the trunk, the agents' questions were not overly intrusive, and the agents' questions about citizenship, vehicle ownership, vehicle contents, destination and travel plans all bore a reasonable relationship to the agents' duties. *See Id.*

The Court finds that here, just as in *Massie,* applying a common sense view of the totality of the circumstances, ample evidence supports Agent Escajeda's determination that suspicious circumstances existed to justify both the line of his questioning and the duration of his detention of Mr. Briscoe. Notably the Tenth Circuit has found that "any distinction between primary and secondary inspection is meaningless." *Rascon-Ortiz,* 994 F.2d at 753. Accordingly, because the stop remained within the scope of the routine checkpoint stop until the discovery of the warrant for Austin Epps, all of Agent Escajeda's observations of Mr. Briscoe before he learned of the warrant are relevant to whether suspicious circumstances existed to justify the continued detention of Mr. Briscoe.

Agent Escajeda first began to develop suspicions when Mr. Briscoe appeared nervous prior to any questioning, namely, fidgeting with his backpack. Doc. 111 at 2. He also failed to produce identification. *Id.*; H'rg Tr. At 75:15–20. The fact that the van did not have registration tags or a license plate and that Mr. Briscoe did not seem to know how to open the van door also raised Agent Escajeda's suspicion. H'rg Tr. At 72:19–23, 98:5–15. Mr. Briscoe argues that Agent Escajeda's observation that Mr. Briscoe had apparently fresh tattoos on his face should not form the basis for a finding of suspicious circumstances. Doc. 115 at 5. He asserts that "monitoring facial tattoos in no way relates to the duties of a border patrol agent to protect the nation's borders

against the smuggling of contraband." *Id.* Agent Escajeda, however, testified that USBP agents are given literature about how to spot tattoos that may signify gang membership or conceal an individual's identity. *Id.* at 74:12–14, 75:1–6. Agent Escajeda testified that he recalled Mr. Briscoe's "1706" tattoo as being related to an Albuquerque gang. *Id.* at 74:14–19. Further, after Mr. Briscoe pulled into the secondary inspection area, which occurred only two to three minutes after he initially entered the checkpoint, Agent Escajeda observed that Mr. Briscoe had urinated on himself, another indication that he was nervous and a factor that heightened Agent Escajeda's already-existing suspicion. *Id.* 77:3–4. Mr. Briscoe was only in the secondary area for "a brief time," *id.* at 90:5-15, during which, based on his observations, it was not unreasonable for Agent Escajeda to ask follow-up questions to verify Mr. Briscoe's identity and confirm that the vehicle was not stolen.

Once he escorted Mr. Briscoe into the checkpoint office, Agent Escajeda continued his attempts to verify Mr. Briscoe's identity. Agent Escajeda credibly testified that it is USBP agents' duty to verify an individual's identity when it is in question. H'rg Tr. At 78:4–7. It took only five to 10 minutes for Agent Escajeda to process the identifying information that Mr. Briscoe provided for "Austin Epps." *Id.* at 92: 17–20. At that point, he discovered that Austin Epps had an outstanding warrant, which gave him probable cause to arrest Mr. Briscoe. *Id.* Neither the canine sniff nor the search of the van prolonged the stop, as they occurred while Agent Escajeda verified the information for "Austin Epps." *Id.* at 98:25–99:2. The Court finds that Agent Escajeda's questioning in the checkpoint office leading up to the discovery of the warrant was brief and unintrusive, and reasonably related to his duty to prevent unauthorized persons and contraband from crossing into the United States.

Accordingly, until Agent Escajeda discovered the warrant, his encounter with Mr. Briscoe did not exceed the scope of a routine checkpoint stop. It follows, contrary to the defense's argument, that reasonable suspicion was not required, and his detention of Mr. Briscoe did not violate the Fourth Amendment.

II.   **Mr. Briscoe's *Miranda* rights were not violated, as questions about the ownership of his firearm did not constitute a custodial interrogation.**

It is undisputed that Mr. Briscoe was not *Mirandized* prior to being questioned about the ownership of the gun found in the van, first by Agent Escajeda and again by Officer Vigil. *See generally* Doc. 96 and Doc. 111. Mr. Briscoe argues however that, because he was held in a separate room and was "formally under arrest," law enforcement's questioning was custodial and thus warranted *Miranda* warnings. Doc. 96 at 4. The government argues to the contrary that because neither Agent Escajeda nor Officer Vigil asked about the gun for the purpose of eliciting incriminating statements from Mr. Briscoe, their questions did not amount to a "custodial interrogation," and thus *Miranda* is inapplicable. Doc. 111 at 6.

In *Miranda v. Arizona*, the Supreme Court held that "the prosecution may not use statements . . . stemming from *custodial interrogation* of a suspect unless . . . [p]rior to any questioning, the person [is] warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. 436, 444 (1966) (emphasis added). "The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." *Id.* at 444–45.

Of course, "*Miranda* rights need only be given to a suspect at the moment that suspect is 'in custody' and the questioning meets the legal definition of 'interrogation.'" *United States v.*

11

*Chee*, 514 F.3d 1106, 1112 (10th Cir. 2008).  "[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Questions related to the police's administrative concerns generally fall outside of the protections of *Miranda. Maryland v. King,* 569 U.S. 435, 456 (2013); *see also Pennsylvania v. Muniz,* 496 U.S. 582, 602–03 (1990) (finding that questions asked relating to identification and other recordkeeping needs after the defendant was arrested fell outside the scope of *Miranda*).

In the instant case, Mr. Briscoe was informed at the checkpoint office that he was being formally arrested pursuant to an outstanding warrant for "Austin Epps." Hr'g Tr. at 99:20–24. Agent Escajeda then asked Mr. Briscoe if the gun belonged to him, and Mr. Briscoe confirmed that it did. *Id.* at 80:25–81:3. When Officer Vigil arrived for the purpose of booking Mr. Briscoe on the warrant, he also asked him about the gun; Mr. Briscoe responded that it belonged to him. *Id.* at 105:19–21. The Court agrees that at this point, Mr. Briscoe was formally under arrest and, accordingly, *Miranda* protections would apply to any questions that the agents/officers knew or should have known were reasonably likely to elicit an incriminating response from him.  The questions about ownership of the gun, however, were not that sort of question.  Rather, the evidence demonstrates that those questions fall under the "routine booking exception" to *Miranda*. *Muniz,* 496 U.S. at 603.

Agent Escajeda credibly testified that he asked about the gun to see if agents could inventory it as Mr. Briscoe's personal property or release it to the owner. H'rg Tr. at 102:3–15. He also testified that he would have asked a similar question if Mr. Briscoe had a laptop in the vehicle. *Id.* at 103:1–4.  Officer Vigil informed Mr. Briscoe that he was asking about the gun for

"safekeeping" and to see to whom they could turn it over after Mr. Briscoe was released from jail. *Id.* at 105:23–25. Admittedly, Agent Escajeda testified that, as a result of these questions, the defendant might have revealed that the gun belonged to somebody else, thereby potentially incriminating himself. But, Mr. Briscoe has not presented any evidence that Agent Escajeda knew or reasonably should have known that his question would elicit such an incriminating statement. *Innis,* 446 U.S. at 301. Both Agent Escajeda and Officer Vigil believed that Mr. Briscoe was Austin Epps who, to their knowledge, did not have a felony record and thus could lawfully own a gun. H'rg Tr. at 81:4–12, 109:10–18.  Because Mr. Briscoe's admission that he owned the firearm was given in response to routine administrative questions, rather than questions reasonably likely to elicit an incriminating statement, they fall outside the scope of *Miranda* protections.  Accordingly, neither Agent Escajeda nor Officer Vigil violated Mr. Briscoe's Fifth Amendment rights in questioning him about his ownership of the firearm without first *Mirandizing* him.

## CONCLUSION

For the reasons set forth above, the Court finds that Agent Escajeda did not violate Mr. Briscoe's Fourth Amendment rights, because his detention of Mr. Briscoe did not exceed the scope of a routine checkpoint stop. The Court further finds that neither Agent Escajeda nor Officer Vigil violated Mr. Briscoe's Fifth Amendment rights, because Mr. Briscoe's statements regarding his ownership of the firearm were not subject to *Miranda* protections. Mr. Briscoe's Motion to Suppress Evidence and Statements [Doc. 96] is therefore **DENIED.**

**Dated this 6th day of October, 2023.**

MARTHA VAZQUEZ
Senior United States District Judge

13