IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

                                      Case No. 20-CR-1777-MV

    v.

DAKOTA BRISCOE,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendant Dakota Briscoe's Motion to Suppress Identification Evidence. Doc. 95. The Court, having considered the Motion, briefs, and relevant law, and being otherwise fully informed, finds that the Motion is well-taken and will be granted.

## BACKGROUND

As part of a nine-count Second Superseding Indictment, Mr. Briscoe is charged with, *inter alia,* carjacking in violation of 18 U.S.C. § 2119(1) on August 28, 2020. Doc. 84. Mr. Briscoe contends that introduction of the alleged carjacking victim's out-of-court identification into evidence would violate his Due Process rights. Doc. 95 at 2. Specifically, he contends that the photo array presented to the victim, John Doe, was unduly suggestive and that his identification of Mr. Briscoe was otherwise unreliable. *Id.* The following represents the Court's finding of facts, based on the evidence submitted by the parties and the testimony presented at the September 18, 2023, hearing.

At around 11:30 a.m. on August 28, 2020, a male suspect banged on John Doe's back screen door. Government's Exhibit C-1 ("Exh. C-1") at 3:11–12. Thinking that his father was at the door, John Doe went to the door, and when he did not see his father, he went outside to the

1

backyard. *Id.* at 3:14–18. Once outside, John Doe heard a voice say, "I have a gun. I've been shot. Like, I need help." *Id.* at 3:18–20. The suspect pointed the gun at John Doe and said, "I need your keys. Like, I need to get out of here." *Id.* 3:24–4:1. John Doe agreed to give him the keys and the suspect followed John Doe into the house. *Id.* at 4:2–5. The suspect then tried to leave through the front gate, which was locked. *Id.* at 4:6–8. When he was unable to open the gate, he tried to shoot at the lock but missed and ended up jumping over the fence. *Id.* at 4:6–9. After John Doe locked the doors to his house and called his dad to ask where his gun was, the suspect had jumped back into the yard and broken the front window of the house. *Id.* at 4:10–15. The suspect then yelled at John Doe to come outside because the car door would not open. *Id.* at 4:16–18. John Doe reported that the suspect said, "Come out here or I'm going to shoot you." *Id.* at 4:22. When John Doe was unable to open the car door, the suspect found a rim that was in the front yard and smashed the car window. *Id.* at 5:6–10. The suspect was then unable to start the car and asked John Doe to help him. *Id.* at 5:11–13. After John Doe started the car for him, the suspect drove off. *Id.* at 5:12–13.

On that same day, deputies with the Bernalillo Country Sherriff's Office ("BCSO") were responding to a call about shots fired in the area of John Doe's residence. Rough Hearing Transcript ("H'rg Tr.") at 30:4–5.[1] One deputy was flagged down by an unknown witness, who informed the deputy that a car had been stolen in the neighborhood. *Id.* at 30:8–11. Deputy Bellastari arrived on the scene and an unknown witness informed him that a man named G.V. had recently fled the area. *Id.* at 32:20–22.[2] Based on this information, Deputy Bellastari believed that

---

[1] The Court's citations to the transcript refer to the court reporter's original, unedited version; any final transcripts may contain slightly different page and/or line numbers.

[2] This information was relayed secondhand by Detective Jessica Carreon, who testified that she reviewed Deputy Bellastari's report and spoke with him to confirm the information contained in the report. *See* H'rg Tr. at 33:20–22.

G.V. was the person who stole John Doe's car. *Id.* at 32:17–18. Although it is unknown exactly when Deputy Bellastari met with John Doe, he did speak to John Doe at some point on that day (August 28, 2020).  *Id.* at 32: 12–13. At the suppression hearing, BCSO Detective Jessica Carreon testified that Deputy Bellastari looked up a picture of G.V. using a database and showed the picture on his cellphone to John Doe, who positively identified G.V. as the person who stole his car. *Id.* at 33:6–20, 120:8–9. John Doe also spoke with BCSO Detective Carroll on the day of the carjacking. *Id.* at 34:8–10. Detective Carreon testified that she listened to Detective Carroll's interview of John Doe and that, during the interview, John Doe described the suspect as being "light complected" and having "slicked back hair." *Id.* at 34:14–23.

The day after the carjacking, the suspect returned to John Doe's house to return the car keys. Hr'g Tr. 36:1–3. John Doe was unable to see the suspect's face at that point because the suspect was wearing a face mask and sunglasses. *Id.* at 36:7–12. John Doe reported, however, that he was able to recognize the suspect because of his voice. *Id.* at 36:4–6.

On September 3, 2020, BCSO Detective Laura Dailey conducted a photo array with John Doe in front of his residence. H'rg Tr. at 36:19. The six photographs in the array were chosen by a criminal analyst to resemble the suspect at the time, G.V. *Id.* at 36:23–37:7. The photos were of darker-skinned Hispanic men. *See, generally,* Government's Exhibit D ("Exh. D").  A photo of G.V., in which he appears to have a lighter complexion and slicked back hair, was included in the array. *Id.* Detective Dailey presented the photo array outside of John Doe's house. Hr'g Tr. 37:15–20. After looking through the photos, John Doe asked, "these are the only pictures you have of the suspect?" Transcript of Detective Dailey's September 3 Interview of John Doe ("Tr. Dailey Int.") at 5:7–8. Detective Dailey responded "yeah, because they're the photos for the photo array . . . don't feel obligated to identify." *Id.* at 5:9–11. She then asked, "Not sure?" and John Doe replied,

"uh-uh." H'rg Tr. at 38:10–12.[3] Detective Carreon testified that, from the recording, it appeared that John Doe was not sure if the suspect was in that photo array. *Id.* at 38:13–14. After John Doe confirmed that he was not sure, Detective Dailey instructed him to sign the photo array form to indicate that he did not recognize anybody. Tr. Dailey Int. at 5:15–16. John Doe did not provide a physical description of the suspect to Detective Dailey. *See, generally,* Tr. Dailey Int. After the photo array, John Doe informed Detective Dailey that he had found a pair of red shorts near where his car had been. *Id.* at 7:13–19. On September 4th, BCSO officials recovered the red shorts and found Defendant Dakota Briscoe's driver's license therein. Hr'g Tr. 23:17–19.

After John Doe indicated he was not sure if the suspect was in the first photo array, Detective Carreon conducted an interview with G.V., during which he denied involvement in the shooting and carjacking. H'rg Tr. 43:2–8. Detective Carreon testified that, based on G.V.'s statements to her and John Doe's failure to positively identify him at the photo array, G.V. was eliminated as a suspect. *Id.* 43:12–15. Once BCSO officers had discovered Mr. Briscoe's license near John Doe's house, they began to suspect that Mr. Briscoe was involved in the carjacking. *Id.* at 23:5–6. Following up on this lead, Detective Carreon called John Doe on September 17, 2020 to interview him about the incident. *Id.* at 12:22–25. In that interview, John Doe described the suspect as being a white male around five foot eight, medium build with slicked-back hair. Exh. C-1 at 6:14–25. He further stated that the suspect had tattoos on his arms and was wearing a black "wife-beater" and dark shorts. *Id.* at 6:25–7:2. John Doe also relayed that the suspect told him that he had been shot and showed John Doe the bullet wound under his shoulder. *Id.* at 7:3–9. Lastly,

---

[3] Detective Carreon testified that this was John Doe's response. H'rg Tr. at 38:10–12. The transcript of the interview that the government provided to the Court does not include this response. Tr. Dailey Int. at 5:13. After listening to the recording of the September 3, 2020, interview, the Court agrees with the defense that John Doe replied "uh-uh" in response to Detective Dailey.

John Doe described the suspect as having blue or green eyes, light brown hair, and possibly a teardrop tattoo on his face near his eye. *Id.* at 6:16, 8:5–15.

Detective Carreon contacted criminal analysts at BCSO and requested that they create another photo array based on Mr. Briscoe's driver's license photo. Hr'g Tr. at 24:5–6, 25:9–8. In her request to the criminal analysts, Detective Carreon asked them to include individuals with tattoos on their face. *Id.* at 48: 23–25. On cross-examination, Detective Carreon conceded that the photo array was constructed "based on a photograph from a driver's license, not on the features similar to the suspect at the time of the occurrence." *Id.* at 40:6–9. She did not ask the criminal analysts to include individuals with blue or green eyes. *Id.* at 49:3–4. The BCSO criminal analysts assembled a photo array with six photographs based on Detective Carreon's request and included Mr. Briscoe's driver's license photo as photo number four. Government's Exhibit B ("Exh. B"). When shown the photo array at the hearing, Detective Carreon testified that she would not describe any of the other five men in the photo array as white or Caucasian. H'rg Tr. 40:24–8.  She agreed that Mr. Briscoe was the only person in the photo array whose skin was lighter toned. *Id.* at 41:12–14. She also agreed that none of the photographs in the array showed individuals with slicked-back hair. *Id.* at 41:15–17. Each of the photos featured men with tattoos on their face. *Id.* at 45:1–14. Notably, despite John Doe's description that the suspect had a teardrop tattoo near his eye, Mr. Briscoe did not have a teardrop tattoo on his face in the photo used for the array. *Id.* at 40:11–14.

On September 18, 2020, BCSO Deputy Andrew Limon served as a blind administrator for the photo array prepared at Detective Carreon's request. *See, generally,* Government's Exhibit A-1 ("Exh. A-1"). Deputy Limon did not know that Mr. Briscoe was the suspect and was not otherwise involved in the investigation. Hr'g Tr. at 27:8–14, Exh. A-1 at 3:4–6. John Doe's father was present during the photo array. *Id.* at 66:17–24. Before proceeding with the photo array, John

Doe described the suspect as a "white male, around 5'8," slicked-back hair, tattoos on arms" with "colored eyes and possibly a teardrop around his eye." Exh. A-1 at 3:12–16. He was not sure which eye might have had the teardrop. *Id.* at 3:19–21. John Doe also restated the conditions under which he saw the suspect, noting that the incident occurred in the daylight at 11:30 a.m. and lasted about ten minutes, and that the suspect was within two to three feet of him. *Id.* at 5:13–6:8. John Doe was shown a photo array containing six photos, which Deputy Limon testified was in accordance with BCSO policy. H'rg Tr. at 55:23–56:1. John Doe identified photo four (the photo of Mr. Briscoe) as the suspect. *Id.* at 61:5–17. When asked if any features stood out to him, John Doe asked if he was allowed to look at the photo again. Exh. A-1 at 12:3–7. Against protocol, Deputy Limon allowed him to look at photo four again. *Id.* at 12:8., 65:21-66:1. After looking at the photo again, John Doe then answered that he remembered the shape of Mr. Briscoe's eyes. Exh. A-1 at 12:10–16. He also stated, "I just remember him exactly." *Id.* at 12:17–18. On the photo array form, John Doe wrote "The shape of his eyes stood out to me the most. I am one hundred percent sure this is the guy." Exh. B at 1.

## DISCUSSION

On January 16, 2023, Mr. Briscoe filed the instant motion. Doc. 95. He asks the Court to suppress John Doe's out-of-court identification because it was impermissibly suggestive and unreliable, and therefore violative of his Due Process rights. Doc. 95 at 2. The government filed a response on June 9, 2023, disagreeing with Mr. Briscoe's argument. Doc. 110 at 4. On September 18, 2023, this Court held an evidentiary hearing, during which it heard testimony from Detective Carreon and Deputy Limon. At the conclusion of the hearing, the Court took Mr. Briscoe's motion under advisement. For the reasons set forth herein, the Court finds that suppression of John Doe's identification of Mr. Briscoe is warranted and, accordingly, Mr. Briscoe's Motion to Suppress

must be granted.

**I.      The Court will suppress John Doe's out-of-court identification because it was unduly suggestive and unreliable.**

Courts have articulated a two-pronged test for analyzing the admissibility of a pre-trial identification under the Due Process Clause.  First, the reviewing court must evaluate whether the identification procedures used were "unnecessarily suggestive."  *United States v. Bredy*, 209 F.3d 1193, 1195 (10th Cir. 2000) (citations omitted).  If so, the court next must consider whether, under the totality of the circumstances, the identification is nevertheless reliable.  *Id*. (citing *Neil v. Biggers*, 409 U.S. 188, 199 (1972)).  An identification will be excluded on Due Process grounds only if it fails at both stages of this analysis. *Id.* (assuming arguendo that the identification procedure was unnecessarily suggestive and still finding the identification admissible because it was sufficiently reliable). The defendant has the initial burden of proving by a preponderance of the evidence that an identification procedure was impermissibly suggestive. *English v. Cody,* 241 F.3d 1279, 1282 (10th Cir. 2001) The burden then shifts to the government to prove by clear and convincing evidence that the identification was reliable, independent of the suggestive procedure. *Id; see also United States v. Wade*, 388 U.S. 218, 240 (1967) (providing clear and convincing evidence standard); *United States v. Martin*, 203 F.3d 236, 2000 WL 33526, at *2 (10th Cir. 2000) (unpublished) (same).

**A.  Suggestiveness**

In support of his request that the Court suppress the identification, Mr. Briscoe argues that, under Tenth Circuit law, when a particular photo stands out from the rest, the photo array is impermissibly suggestive. Doc 95. at 4 (citing *United States v. Wiseman,* 172 F.3d 1196, 1209 (10th Cir. 1999)).  He asserts that his photo stood out significantly in the photo array because he was the only white male in the array and his face appears to be digitally enlarged as well as tilted

upward. Doc. 116 at 2. He further contends that the other photos depicted men with different facial characteristics and had different lighting and backgrounds from Mr. Briscoe's photo. *Id.* at 4. Finally, he notes that he is the only one in the line-up with unusually shaped eyes, where the white portion is harder to observe, and is also the only one with tattooed eyebrows. *Id.*

In response, the government argues that the photo array was not unduly suggestive because it was administered according to established protocol, emphasizing that Detective Limon served as a "blind administrator," and thus presented the array in accordance with BCSO policy and New Mexico State law. Doc. 110 at 4. The government further contends that the minor differences among the photos do not make the photo array suggestive. Doc. 110 at 4 (citing *United States v. Kamahele,* 748 F.3d 984, 1020 (10th Cir. 2014) and *United States v. Worku,* 800 F.3d 1195, 1204 (10th Cir. 2014)). Additionally, the government argues that Mr. Briscoe's motion overlooks the many similarities among the photos in the array. *Id.* at 6.

When deciding whether a photo array is suggestive, the Tenth Circuit has identified the following factors as relevant: "the size of the array, the manner of its presentations by the officers, and the details of the photos themselves." *United States v. Sanchez,* 24 F.3d 1259, 1262 (10th Cir. 1994); *see also Wiseman,* 172 F.3d at 1209 (finding that a six-photo array was not a *per se* due process violation, but that the low number of photos was a factor to be considered in determining suggestiveness). With respect to the size of the array, "the lower the number of photos used by officers in a photo array, the closer the array must be scrutinized for suggestive irregularities." *Sanchez,* 24 F.3d at 1262. In particular, a six-photo array is "a number sufficiently small to weigh *heavily* in the balance of factors to be considered." *Id.* at 1263 (emphasis added). Looking to the manner of presentation, officers may not engage in "coaching" by giving witnesses information that may taint the procedure. *Grubbs v. Hannigan,* 982 F.2d 1483, 1490 (10th Cir. 1993). Lastly,

with respect to the details of the photos, "a photo line-up is not necessarily suggestive merely because the individuals in the lineup differ in facial characteristics." *Id; see also Kamahele,* 748 F.3d at 1020. Nevertheless, a photo array may be suggestive where the individuals photographed have "noticeably dissimilar" facial characteristics from the defendant. *Id.* For instance, in *Grubbs,* the Court found that the photo array was suggestive where some of the differences among the photos were "strikingly apparent," including a swollen eye, and others were an important component of the witness's description, namely the defendant's hairstyle. *Id.*

The defense does not contend, and the Court does not find, that Deputy Limon administered the photo array in an inappropriate or suggestive manner. Doc. 95. Deputy Limon did not create the line-up nor did he know that Mr. Briscoe was the suspect of the carjacking investigation. Hr'g Tr. at 27:8–14, Exh. A-1 at 3:4–6. He used a standard "Photographic Line-up Process Sheet," which contained warnings to the witness that the suspect may or may not be included in the line-up, and he read those warnings aloud to John Doe. Exh. B at 1.[4]

However, the low number of photos in the array "weighs heavily" towards finding the line-up suggestive. *Sanchez*, 24 F.3d at 1262-63. Here, there were only six photos in the array. *See* Exh. B. While a six-photo array is not *per se* unconstitutional, the Tenth Circuit has recognized that "when a relatively low number of photos are used in an array, minor differences such as background color can make a picture stand out." *Id.* at 1262. Applying the stricter lens required by the low number of photos, the Court finds that the combination of differences among the photos, including differences in skin tone, lighting, and facial features, made Mr. Briscoe's photo stand

---

[4] While the presentation of the original array was not suggestive, Deputy Limon, against established protocol, allowed John Doe to look at photo number four again after he identified the individual represented in that photo as the suspect. H'rg Tr. at 65:21-66:1. While this does not render the entire manner of presentation suggestive for purposes of determining suggestiveness, it does raise questions about the reliability of the identification, which is addressed below.

out and rendered the array impermissibly suggestive. In *Wiseman,* the Court found that the differences between the pale skin tone of the defendant and the "natural" skin tone of the other five photos were significant because they were "not diluted by the use of a substantial number of photos." 172 F.3d at 1209. Here, Detective Carreon, who requested that the photo array be composed of individuals with face tattoos, testified that Mr. Briscoe was the only white male in the array. H'rg Tr. 40:24–8. This is arguably a more suggestive arrangement than the one in *Wiseman*, where there was no allegation that the photos depicted individuals of different races, merely that the defendant was significantly paler than the other individuals. 172 F.3d at 1209.  The difference in race is especially salient because John Doe on two separate occasions described the suspect as a white male. Exh. A-1 at 3:12–16; Exh. C-1 at 6:14–25.

Differences in facial characteristics can make an array suggestive where they related to "an important component of [the witness's] description" of the suspect. *Grubbs,* 982 F.2d at 1490. In *Grubbs,* for instance, the Court found that slight differences in hair style were relevant because that was how the witness identified the suspect. *Id.*  Here, several differences in facial characteristics among the photos related to John Doe's description of the suspect. John Doe repeated that the suspect possibly had a teardrop tattoo near one of his eyes. *Id.* In photo four, Mr. Briscoe does not have a teardrop tattoo near either of his eyes. Exh. B. Two of the other men in the array do have teardrop or teardrop-like tattoos near their eyes. *Id.* As Detective Carreon testified, however, these two other men (photo one and photo six) were not white. *Id.* Further, John Doe described the suspect as having blue or green eyes. H'rg Tr. at 6:16, 8:5–15, Mr. Briscoe is the only one in the array whose eyes (although they are hard to see) are not brown. Exh. B. The differences in facial tattoos and eye color are rendered significant because John Doe specifically listed these details in his description of the suspect.

The government cites to *Kamahele* and *Worku* for the proposition that differences in facial characteristics do not necessarily make an array suggestive. Admittedly, in *Kamahele*, the Tenth Circuit rejected the defendant's argument that different facial features made the photo array suggestive. 748 F.3d at 1020. Here, however, in addition to depicting individuals with different facial features, the photos in the array presented to John Doe were of individuals with markedly different skin tones and had different background color and lighting. In combination, these differences made Mr. Briscoe's photo stand out. *Worku* is also distinguishable. In that case, there was a "passage of over 30 years" between the witnesses' sightings and the photo arrays. 800 F.3d at 1204. The Tenth Circuit noted that, given this long gap in time, "the differences in facial hair and clothing could be downplayed," as the "victims likely would have focused on the individuals' faces rather than their facial hair or clothing." *Id.* In contrast, there was only a three-week gap between the carjacking and John Doe's identification of Mr. Briscoe from the photo array. Accordingly, there is no reason to surmise that, as in *Worku*, Mr. Doe would have "downplayed" the differences among the photos.

Beyond facial characteristics, the photos in the array in this case, as in *Wiseman,* were sufficiently different in lighting and background color to create the "inference that [the photo of the defendant] was taken under different circumstances," and that "the other photos were assembled to provide a pool or control group." 172 F.3d at 1209. Other than Mr. Briscoe's photo, the photos in the array  have a bright blue/green background that looks like a green-screen or other form of digital background and appear to be lit straight on. *Id.* In contrast, in his photo, Mr. Briscoe is standing in front of a textured wall, and his photo is noticeably darker as he appears to be lit from the right. *Id.* These differences would indicate that Mr. Briscoe's photo, which was pulled from his driver's license, was taken under different circumstances than the other photos, which

were assembled to provide a control group.

These differences are even more significant given that the photo array was created not from John Doe's description of the suspect, but rather from the photo of Mr. Briscoe on his driver's license. Hr'g Tr. at 40:6–9. As a result, none of the men depicted had "slicked back hair," was white, or had light-colored eyes, even though John Doe reported these details about the suspect to both Detective Carreon and Deputy Limon. Exh. A-1 at 3:12–16; Exh. C-1 at 6:14–25. Indeed, John Doe chose the only photo in the array of a white male with light-colored eyes. For these reasons, the Court finds that the photo array was unduly suggestive.

### B.  Reliability

Having determined that the photo array was unnecessarily suggestive, the Court must examine "whether under the 'totality of the circumstances' the identification was reliable even though the [photo array] procedure was suggestive." *Bredy*, 209 F.3d at 1195.  Mr. Briscoe argues that John Doe's identification of him was not sufficiently reliable. H'rg Tr. 116:1–8. In support of this argument, Mr. Briscoe contends that because John Doe first identified G.V. on the day of the instant offense, there is a substantial risk of irreparable mistaken identification. *Id.* The government argues to the contrary that, under the totality of the circumstances, John Doe's identification of Mr. Briscoe is reliable. *Id.* at 114:20–115:12. According to the government, John Doe's prior identification of G.V. does not undermine the fact that John Doe interacted with the suspect for 10 minutes in broad daylight and was certain of his identification when he picked Mr. Briscoe in the photo array. *Id.*

The court "must evaluate the reliability of the identification under the totality of the circumstances to determine whether the suggestive [photo array] created a substantial likelihood of irreparable misidentification." *Bredy*, 209 F.3d at 1195.  Thus, "the central question [is] whether

under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Biggers*, 409 U.S. at 199–200 (1972). In evaluating the likelihood of misidentification, the court considers factors including "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id.* Notably, the court is "required" to consider both "any identification prior to lineup of another person" and "the existence of any discrepancy between any pre-lineup description and the defendant's actual description" in its reliability analysis. *Wade*, 388 U.S. at 240. The government bears the burden of demonstrating by clear and convincing evidence that the identification is reliable. *English,* 241 F.3d at 1282; *Wade*, 388 U.S. at 240; *Martin*, 203 F.3d 236, 2000 WL 33526, at *2.

Under the totality of the circumstances, the Court finds that the government has not dispelled the substantial likelihood of irreparable misidentification caused by the suggestive identification procedure.  Arguably, two of the relevant factors point toward reliability, namely, John Doe's opportunity to view the suspect at the time of the crime (the incident occurred in the daylight at 11:30 a.m. and lasted about ten minutes, the suspect was within two to three feet of John Doe during the incident, and John Doe interacted with the suspect three separate times in three separate locations during the incident), and the length of time between the incident and the photo array (only three weeks).  The remainder of the circumstances, however, tip the balance in the other direction.

First, the government has failed to establish that John Doe's degree of attention was sufficiently high or careful, as it did not introduce his testimony at the hearing.  Next, as to the accuracy of John Doe's prior description of the suspect, he described a 5'8" white male with

slicked back hair, blue/green eyes, tattoos on his arms, and a teardrop tattoo near his eyes.  In the photo of Mr. Briscoe in the photo array, he does not have "slicked back hair," but rather is bald, and has no teardrop tattoo near his eyes – a rather unique, and thus significant, detail.  Accordingly, there exists a "discrepancy" between John Doe's description prior to the photo array and Mr. Briscoe's appearance in the photo array. And while John Doe demonstrated certainty that Mr. Briscoe was the perpetrator, writing in the photo array worksheet that "the shape of his eyes stood out to me the most. I am one hundred percent sure this is the guy," Exh. B. at 1, he did so not during the photo array, but rather only after he was permitted to look at Mr. Briscoe's photo a second time, in violation of BCSO policy. H'rg Tr. at 65:21-66:1. Accordingly, John Doe's certainty must be discounted, as it was the product of an improper second look at Mr. Briscoe's photo. Finally, and perhaps most significantly, John Doe identified another person as the perpetrator of the carjacking prior to the photo array.  Specifically, on the day of the carjacking when, presumably, the details were freshest in his mind, John Doe positively identified an individual named G.V. as the person who stole his car. *Id.* at 33:6–20, 120:8–9. Indeed, the details that John Doe provided that day, namely, that the perpetrator was "light complected" and had "slicked back hair," accurately portrayed G.V. *Id.* at 34:14–23.  From the limited evidence before the Court, it appears that John Doe's identification of G.V. was arguably more reliable than his identification of Mr. Briscoe. And because the government did not introduce John Doe's testimony at the hearing, it remains unclear why John Doe previously positively identified a different suspect and was subsequently unsure if that suspect was in the first photo array. Without his testimony, it is also unclear whether the prior positive identification affected his identification of Mr. Briscoe in the second photo array.

Accordingly, the Court finds that the government has not carried its burden to show by

clear and convincing evidence that the identification of Mr. Briscoe was reliable. Evidence is clear "if it is certain, unambiguous, and plain to the understanding" and it is convincing "if it is reasonable and persuasive enough to cause the trier of facts to believe it." *Foster v. Alliedsignal, Inc.,* 293 F.3d 1187, 1194 (10th Cir. 2002). Here, the evidence is ambiguous and unpersuasive, as it leaves unanswered questions central to the Court's reliability analysis, including why John Doe positively identified Mr. Briscoe despite the discrepancies between his initial description of the suspect and Mr. Briscoe's appearance in the photo array, why John Doe positively identified a different person immediately after the incident, and whether, in the first instance, John Doe was able to pay adequate attention during the incident to reliably identify anyone.  For these reasons, there are insufficient indicia of reliability to overcome the suggestiveness of the identification procedures. *Martin,* 203 F.3d at 836.  The Court thus will suppress John Doe's out-of-court identification of Mr. Briscoe.

## II.     The Court also will suppress John Doe's in-court identification of Mr. Briscoe.

Although judicial pre-screening of in-court identifications is not required, *Perry v. New Hampshire,* 565 U.S. 228 (2012), where in-court identifications would be impermissibly tainted by previous suggestive identifications, Due Process also requires exclusion of the in-court identification. *See United States v. de Jesus-Rios*, 990 F.2d 672 (1st Cir. 1993) (finding that because the pretrial identification was suggestive and unreliable, the witness's identification testimony, including his in-court identification, should have been suppressed); *United States v. Warford,* No. 20-cr-1208, 2022 WL 17620770 (D.N.M. Dec. 13, 2022) (suppressing any in-court identification testimony because there were no independent indicia of reliability for the in-court identification); *United States v. Smith*, 429 F. Supp. 2d 440, 453 (D. Mass. 2006) (suppressing a witness's in-court identification where "any future in-court identification by [the witness] in this

15

case would suffer from the same grave reliability problems that afflict the [pretrial] identifications."); *Simmons v. United States,* 390 U.S. 377, 383–84 (1968) (after an initial pre-trial identification, "the witness thereafter is apt to retain in his memory the image of the photo rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification.").

Having found that the pretrial identification of Mr. Briscoe was unnecessarily suggestive, the Court equally finds that any in-court identification by John Doe of Mr. Briscoe would suffer from the same grave reliability problems. Further, given that John Doe has now identified Mr. Briscoe's photo as depicting the perpetrator of the carjacking, he is apt to retain in his memory the image of that photo, rather than of the person whom he saw, which further reduces the trustworthiness of any in-court identification. For these reasons, the Court finds that Due Process requires the exclusion of any in-court identification of Mr. Briscoe by John Doe. John Doe thus will not be permitted to make an in-court identification of Mr. Briscoe.

## CONCLUSION

For the reasons set forth above, the Court finds that the photo array was unnecessarily suggestive and that the United States has not offered sufficient indicia of reliability to outweigh the suggestiveness. Accordingly, Due Process requires the suppression of John Doe's identification of Mr. Briscoe.

**IT IS ORDERED** that Mr. Briscoe's Motion to Suppress [Doc. 95] is **GRANTED**, as follows: the Court will suppress testimony about the pretrial identification and exclude any in-court identification by John Doe.

Dated this 19th day of October, 2023.

_____
MARTHA VAZQUEZ
Senior United States District Judge