IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                 No. 20 CR 01777 MV

DAKOTA BRISCOE,

       Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on Defendant Dakota Briscoe's Motion to

Suppress Statements. Doc. 67. The government filed a Response to the Motion. Doc. 77. The

Court, having considered the briefs, relevant law, and being otherwise fully informed, finds that

Mr. Briscoe's motion to suppress his statements will be granted in part.

**BACKGROUND**

Following his arrest on September 16, 2020, Mr. Briscoe was booked into the Dona Ana

County Correctional Center ("DACCC"). Doc. 67 at 2. On September 18, Detective Acata and

Task Force Officer Isaac Romero from the Albuquerque Police Department ("APD") drove to

DACCC to speak with Mr. Briscoe regarding his state murder charges. *Id.* Mr. Briscoe was brought

to an interrogation room in an orange jumpsuit and his hands were cuffed to the table. *Id.* When

Mr. Briscoe sat down, he said "You guys are just here to charge me right? Because I don't have

anything to say." *Id.* Neither officer acknowledged his statement. *Id.* Detective Acata began to

read Mr. Briscoe his *Miranda* rights and Mr. Briscoe interrupted her, saying that he knew his

rights, but she responded that she still needed to go through them with him. *Id.* at 2-3. She turned

1

the paper so that he could read along as she went through them. *Id.* at 3. Regarding the right to an attorney, when she began to explain, "If you feel like you can't afford one, we can –," Mr. Briscoe interrupted, "I can't afford one." *Id.* Detective Acata then asked, "Do you understand that?" Mr. Briscoe answered, "Yes." *Id.* When Detective Acata finished reading the *Miranda* rights, Mr. Briscoe immediately said, "I want to talk to a lawyer," and added, "I'm sorry miss, but I'm sorry to be like that, but I think I need to speak to a lawyer because I don't know what I've been charged with." *Id.* Detective Acata continued, as follows:

> So, I'm gonna tell you what you're charged with. You're charged with two counts of murder; open counts, so first-degree murder. You're charged with aggravated arson. So we have you on video before, during, and after. Okay? Everybody has identified you. Every single person we talked to. You've also been identified leaving with them ten minutes before they're dead. So we, I, have all of it. That's why I was giving you the opportunity. That's it.

*Id.*

Mr. Briscoe then said, "You guys know they were taking me to kill me." *Id.* The following conversation then took place:

> Det. A.: So here's the thing Dakota, you've asked for an attorney. I would love to hear your side; I want to hear your side. But understand that if you talk to me right now there's not gonna be an attorney here and I want to hear what happened.
>
> DB: So are we already being recorded?
>
> Det. A.: This whole building is recorded, honey. I mean that's just…But I need you to understand that we went over your Miranda rights. You said that you wanted an attorney. If you want to talk to me because you initiated that they were going to kill you, I want to hear about that.
>
> DB: Alright. Let's do it.
>
> Det. A: Okay. Understand that you won't have an attorney here while you're telling me what they did.
>
> DB: Why? Why is that? Why can't I have an attorney here now?

2

Det A.: No, I'm saying…because we don't have the ability to bring an attorney. If you and I are going to have a conversation right now I just want to make sure that you understand that.

DB: I do. I do want to have a conversation. But I want my attorney here.

Det A.: Okay, so…

DB: My attorney should have been here in the first place and that's what I asked for.

Det. A: Okay. So you don't have an attorney on my charges.

DB: Oh. I need one.

Det A.: Okay. But that's what I'm saying. So you say you want to talk but you want your attorney here. I can't bring an attorney here right now 'cause you don't have an attorney.

DB: You're just trying to fuck me.

Det. A.: No, I'm not. I am making sure that you understand your rights.

DB: You guys don't even know what happened at all though.

Det. A: But that's why…but Dakota, that's why I wanted to come and talk to you. I told you I know that it's a Micro Draco. I know it was in the front floorboard. I know that it belongs to Nathan. I know Nathan was sitting in the passenger seat. I know Eric was sitting in the driver's seat. I know all of that. Does that make sense?

DB: Yeah. I mean if you know all that.

Det. A: What I'm saying is, I think something happened in that car to you. You said they were taking you to kill you. I would love to hear about that. But understand that if we talk about it, there is not an attorney here right now.

DB: No matter what I'm gonna get hit though. No matter what.

Det. A: So Dakota, do you want to tell me about that portion of it now? I'm asking you because you're the one – you're the one who said they were going to kill you. So I have to make sure that you understand that if we talk about that part of it, that your attorney is not here.

DB: Are you really trying to help me?

Det. A: I am only here to record the facts. You can ask anybody. I have been doing homicides since 2014. The only thing I want is the truth. That's it. I have no bias against you. I have no bias against Nate. I have no bias against Eric. I have no bias against anybody.

TFO R.: Hey Dakota, you know we've gotten several stories correct?

DB: Let's see from who?

TFO R.: We're here now to get yours.

DB: Can you show me whose stories you have?

Det. A.: So Dakota…

DB: I'm gonna get them regardless, right?

Det. A: Yeah and you will. I'm going to make sure you have a copy of your arrest warrant. But that's what I'm saying. So here's the funny thing about *Miranda*…

DB: Can you get me to Albuquerque?

Det. A: You're going to Albuquerque today.

DB: Today?

Det A: Yeah, we're transporting you. Here's the reason that I …Like I said I do want to talk to you because you made some statements in reference to them wanting to kill you. I just have to make sure that you understand that if you tell me about that, your attorney is not here right now. I want to hear about it.

DB: I can't say anything incriminating to anybody else that's not dead, so…I'm not a snitch. If I know anything about this then I really can't say nothing you know?

Det A.: Well, okay. You're not a snitch because you've been talking about it on the phone. We have those recorded conversations.

DB: Okay. Either way you know what it was. You have her phone too right?

Det. A: Who?

DB: My baby mama.

Det. A: I do. I have her phone. But do you understand what I'm saying. I'm only here Dakota to get your side. That is it. And I will report your side.

*Id.* at 3–6.

After this conversation, Mr. Briscoe said, "All right. I'm gonna tell you. I mean you're probably not going to understand it. And I don't give a fuck." *Id.* at 6. Mr. Briscoe gave Detective Acata his version of the events of September 7, 2020, and made several incriminating statements regarding the murders and carjackings. *Id.* at 6. Mr. Briscoe was then booked into the Metropolitan Detention Center ("MDC") for murder, aggravated arson, aggravated assault, aggravated auto burglary, aggravated residential burglary, attempted armed robbery, unlawful taking of a motor vehicle, and shooting at or from a motor vehicle. *Id.*

Four days after this initial interview on September 22, 2020, attorney Liane Kerr entered her appearance on the state charges. *Id.* On September 25, 2020, while Mr. Briscoe was in custody at MDC, FBI agents Bryan Acee and Leysha Lopez-Reccie, along with APD Task Force Officer Jessica Carreon, arrived at the facility to interview him. *Id.* After reading Mr. Briscoe his *Miranda* rights, the agents interviewed Mr. Briscoe at MDC without counsel present. *Id.*

## DISCUSSION

I.    **The Court will not allow the government to introduce as substantive evidence Mr. Briscoe's statements from his interviews with law enforcement officials conducted on September 18, 2020 and September 25, 2020.**

On September 18, 2020 and September 25, 2020, APD officers and FBI agents interviewed Mr. Briscoe without counsel present. Doc. 67 at 2–5. The government concedes that at both interviews, law enforcement violated Mr. Briscoe's right to counsel. Doc. 128 at 2. Accordingly, the government will not seek to introduce Mr. Briscoe's statements made during those interviews as substantive evidence. Doc. 77. Although the government argues that Mr. Briscoe's motion is moot, the Court interprets the government's Response as an agreement that Mr. Briscoe's statements were elicited after a violation of his right to counsel and are therefore inadmissible as

substantive evidence. *See Edwards v. Arizona,* 451 U.S. 477 (1981) (finding that the defendant's confession made after he invoked his right to counsel was inadmissible). Thus, the Court finds that because Mr. Briscoe's motion to exclude his statements as substantive evidence is unopposed, and because the parties agree that FBI agents violated Mr. Briscoe's right to counsel, Mr. Briscoe's motion is granted with respect to the suppression of his statements as substantive evidence.

II.     **Mr. Briscoe's statements from his September 18, 2020 interview are also inadmissible for impeachment purposes.**

Because the Court was initially unclear as to whether Mr. Briscoe sought to suppress introduction of his statements for all purposes, the Court requested supplemental briefing from both parties. In his supplemental brief, Mr. Briscoe clarifies that he seeks suppression of his statements for all purposes, including impeachment. Doc. 127 at 6. The government argues in its supplemental brief that Mr. Briscoe's statements are admissible for the limited purpose of impeachment because his confession was voluntary. Doc. 128 at 2. Ultimately, because the government has not proven by a preponderance of the evidence that Mr. Briscoe's confession was voluntary, the Court finds that, should he choose to testify, the government may not use Mr. Briscoe's statements from September 18, 2020 to impeach him.

Mr. Briscoe first argues that when a defendant is interrogated after his right to counsel has been violated, his statements are presumed involuntary. Doc. 128 at 6 (citing *McNeil v. Wisconsin,* 501 U.S. 171 (1991)). It follows, his argument continues, that because his statements are presumed to be involuntary, they are inadmissible for any purpose, including impeachment. *Id.* at 8 (citing *Mincey v. Arizona,* 437 U.S. 385 (1978)). This argument, however, misunderstands the Supreme Court's case law.

Once an individual subject to custodial interrogation expresses a desire for counsel, that individual is "not subject to further interrogation by the authorities until counsel has been made

available to him, unless the accused himself initiates further communication." *Edwards,* 451 U.S. at 485. Statements elicited in interrogations initiated by police after the defendant has invoked his right to counsel are presumed involuntary and are "therefore inadmissible *as substantive evidence at trial.*" *McNeil,* 501 U.S. at 177 (emphasis added). Importantly, the *Edwards* exclusionary rule "is not a constitutional mandate, but judicially prescribed prophylaxis" designed to deter police violations of the right to counsel. *Maryland v. Shatzer,* 559 U.S. 98, 105 (2010). Concluding that extending the *Edwards* exclusionary rule to impeachment would not add much deterrent value, the Supreme Court has held that statements elicited after a violation of the right to counsel are admissible for impeachment purposes. *Michigan v. Harvey,* 494 U.S. 344, 349 (1990) ("[T]he search for truth in a criminal case outweighs the speculative possibility that exclusion of evidence [for impeachment purposes] might deter future violations."). *Id.* at 3553.

In contrast to its case law holding that statements presumed to be involuntary under the *Edwards* rule are admissible for impeachment purposes, the Supreme Court has held that *factually* involuntary statements are inadmissible for all purposes (including impeachment). *See Mincey v. Arizona,* 437 U.S. 385, 398 (1978) ("[A]ny criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law.") (emphasis added). The Supreme Court has never extended this rule to statements that are presumed involuntary under the *Edwards* prophylactic rule, instead consistently holding that confessions made after a violation of the right to counsel may be used to impeach a defendant. *Harvey,* 494 U.S. at 344; *see also United States v. Havens,* 446 U.S. 620, 627–28 (1980) (finding that confessions elicited after a violation of the right to counsel are inadmissible only as substantive evidence). This Court is bound by this Supreme Court precedent and thus declines to hold that statements that are merely *presumed* to be involuntary must be suppressed for all purposes, including impeachment.

In the alternative, Mr. Briscoe alleges that his confession on September 18, 2020 was involuntary in fact and, for this independent reason, his statements made that day are inadmissible for any purpose, including impeachment. *See New Jersey v. Portash,* 440 U.S. 450, 459 (1979) (involuntary incriminating statements are inadmissible for all purposes). Specifically, Mr. Briscoe argues that he was subject to "coercive badgering" that overbore his will and rendered his confessions involuntary. Doc. 127 at 8. He further contends that his decision to speak cannot be construed as a voluntary waiver of his *Miranda* rights. *Id.* The government disagrees, arguing that under the totality of the circumstances, Mr. Briscoe's statements were voluntary. Doc. 128 at 6–8.

To determine whether a confession was involuntary as a matter of fact, courts must assess the totality of the circumstances, including the characteristics of the accused and details of the interrogation. *Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973). The Tenth Circuit has held that the following factors are relevant to the voluntariness determination: "(1) the age, intelligence, and education of the defendant; (2) the length of the detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of her constitutional rights; (5) whether the defendant was subject to physical punishment." *United States v. Glover,* 104 F.3d 1570, 1579 (10th Cir. 1997). No single factor is determinative, and courts must assess the totality of the circumstances. *Id.* Where a defendant talks to officers after invoking his right to counsel, "the government bears the burden of proving by a preponderance of the evidence the waiver of the right was voluntary." *United States v. Roman-Zarate,* 115 F.3d 778, 782 (10th Cir. 1997).

Considering the totality of the circumstances, the Court finds that the government has not met its burden of demonstrating the voluntariness of Mr. Briscoe's confession. Arguably, some of the relevant factors point towards finding that Mr. Briscoe voluntarily waived his rights. There are no allegations that his age or education level rendered him unable to understand his rights, there is

no evidence of physical punishment, and the interviews were not particularly lengthy. However, these factors are not dispositive. *United States v. Young,* 964 F.2d 938, 946 (10th Cir. 2020). Thus, the remainder of the circumstances, absent evidence from the government to the contrary, tip the balance in the other direction.

First, the government has failed to establish that the nature of the questioning was not coercive. Mr. Briscoe alleges that Detective Acata and TFO Romero pressured him into speaking by reminding him that they were there for his side of the story and suggesting that his side of the story could change the charges. Doc. 127 at 8. A police officer's misrepresentations or deceptions, although not dispositive, may render a confession involuntary. *Young,* 964 F.3d at 943. Promises of leniency or other statements indicating that the officer is there to help the defendant are also relevant. *Id.* In *Young,* the Court held that even though the defendant was 43 years old, had a GED, was properly advised of rights, knew he could stop the interrogation, and was only questioned for a short time, the officer's misrepresentations and deceptions rendered the confession involuntary. *Id.* at 946.

Here, Detective Acata and TFO Romero made several statements to Mr. Briscoe indicating that they were on his side and just wanted to get his version of the truth. For instance, Detective Acata said, "What I'm saying is, I think something happened in that car to you. You said they were taking you to kill you. I would love to hear about that." Doc. 67 at 4. When Mr. Briscoe asked if they were really trying to help him, Detective Acata responded, "I am only here to record the facts. You can ask anybody. I have been doing homicides since 2014. The only thing I want is the truth. That's it. I have no bias against you. I have no bias against Nate. I have no bias against Eric. I have no bias against anybody." *Id.* TFO Romero added, "Hey Dakota, you know we've gotten several stories correct? . . . We're here now to get yours." *Id.* From the record, it appears that Detective

Acata and TFO Romero were trying to get Mr. Briscoe to talk by inferring that they just wanted to hear his side of the story and by failing to dispel his belief that they were there to help him. This factor thus weighs in favor of finding that Mr. Briscoe's confession and waiver were involuntary.

Regarding the officers' advisement of Mr. Briscoe's constitutional rights, the government does not point to any specific evidence but argues that the transcripts of the interviews show that Mr. Briscoe received and understood those rights. Doc. 127 at 7. However, the transcripts also show that Detective Acata made it seem like Mr. Briscoe could not have an attorney present if he chose to speak to her. Further, the record does not establish that Mr. Briscoe understood that he could choose to have an attorney present when he spoke to law enforcement.

As noted in *Miranda,* clear warnings are "indispensable" in overcoming the inherent pressures of custodial interrogation. 384 U.S. at 468. Accordingly, the *Miranda* Court found that "an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during the interrogation." *Id.* at 471. Consistent with this principle, the Supreme Court in *Florida v. Powell* found that the requirements of *Miranda* were satisfied when a defendant was notified that he had "the right to use any of [the *Miranda*] rights at any time you want during this interview." 559.U.S. 50, 60 (2010). Notably, the Court emphasized that the warnings reasonably conveyed to the defendant that he had a "right to have an attorney present, not only at the outset of interrogation, but at *all times.*" *Id.* at 62 (emphasis added); *see also Duckworth v. Eagan,* 491 U.S. 195, 198 (1989) (finding that the defendant was properly warned where he was advised, "you have a right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning").

*Miranda* warnings are deficient when defendants are presented with the "false choice" of deciding between speaking with law enforcement or obtaining an attorney. For instance, in *Lujan*

*v. Garcia,* the Ninth Circuit held that the defendant's *Miranda* rights were violated when he was presented with the false choice of either speaking with an attorney or speaking with law enforcement officers when they initiated an interrogation. 734 F.3d 917, 931 (9th Cir. 2013). The police in *Lujan* began their interrogation by explaining that the defendant had the right to remain silent and the right to an attorney. *Id.* at 921. They then said, "we'll give you an opportunity to explain your side of the story. And that's – that's what we're looking for. We're looking for the truth." *Id.* When the defendant invoked his right to counsel and asked, "Can I get one in here today?" the detective responded:

> I really doubt it. I mean, I'm going to be honest with you. It's Sunday evening. When you go to court in a couple of days there will be one appointed for you. That's the way the system is set up. If you have funds and you want to call and hire your own attorney. If you want to call and hire an attorney, that's fine . . . if you want to make a statement without an attorney that's up to you. I doubt that if you hire an attorney they'll let you make a statement, they usually don't. That's the way it goes. So that's your prerogative, that's your choice. Now, if you do want to talk to me without an attorney, that's your choice. You can just tell the jailor, 'Hey, I'd like to talk to the detectives without an attorney present.' Okay? That's your choice.

*Id.* at 921–22. Thus, the defendant was informed that he would get an attorney in a few days when he appeared in Court, but not that he had a right to have an attorney during the interrogation. *Id.* Because the defendant was not informed that he had a right to an attorney "at all times," the Court found that the detective's statements "did not comply with the clearly established Supreme Court precedent of *Miranda* and its progeny." *Id.* at 933.

The Seventh Circuit similarly held that law enforcement failed to properly inform a defendant of his rights when he was presented with the "false choice" of having counsel with him before questioning or during questioning. *United States v. Wysinger,* 683 F.3d 784, 800 (7th Cir. 2012). The *Wysinger* Court found that when law enforcement officers, by either deception or obfuscation, do not make clear to defendants that they have a right to have an attorney present

11

during the interrogation, they deprive the defendant of "the knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them. *Id.* (quoting *Missouri v. Seibert,* 542 U.S. 600, 621 (2004) (Kennedy, J. concurring in the judgment)).

Other district courts have determined that a defendant is not properly *Mirandized* when the defendant is inaccurately advised that they may not have counsel present during their interrogation. *See United States v. Smith,* No. 19-0035-01-CR, 2021 WL 3892675, at *19 (W.D. Mo. Aug. 4, 2021) (waiver was not knowingly and intelligently made where law enforcement told him "we are not going to give you an attorney just to talk to us"); *United States v. Avila,* No. 19-CR-3342, 2020 WL572874, at* 7 (W.D. Tex. 2020) (waiver was not knowing and intelligent where agent informed the defendant that she could obtain an attorney "tomorrow"); *United States v. Padilla,* No. 19-CR-208, 2019 WL 7598829, at *8 (finding that waiver was not knowing and intelligent where defendant did not understand that he could have counsel present during questioning). Further, the district court in *United States v. Xi* found that the defendant's waiver and subsequent confession were rendered involuntary because the defendant was informed, "if you cannot afford a lawyer, *no one will be appointed for you before any questioning,* if you wish." No. 16-22-5, 2018 WL, at *9–14 (E.D. Pa. July 6, 2018) (emphasis added).

Here, Mr. Briscoe was presented with a false choice of either speaking to law enforcement and telling them his side of the story or waiting to have counsel appointed. Detective Acata presented the false choice in the following exchange:

> Det. A: So here's the thing Dakota, you've asked for an attorney. I would love to hear your side; I want to hear your side. But understand that if you talk to me right now there's not gonna be an attorney here and I want to hear what happened.
>
> DB: So are we already being recorded?
>
> Det. A: This whole building is recorded, honey. I mean that's just…But I need you to understand that we went over your Miranda rights. You said that you wanted an

attorney. If you want to talk to me because you initiated that they were going to kill you, I want to hear about that.

DB: Alright. Let's do it.

Det. A.: Okay. Understand that you won't have an attorney here while you're telling me what they did.

DB: Why? Why is that? Why can't I have an attorney here now?

Det A.: No, I'm saying…because we don't have the ability to bring an attorney. If you and I are going to have a conversation right now I just want to make sure that you understand that.

DB: I do. I do want to have a conversation. But I want my attorney here.

Det A.: Okay, so…

DB: My attorney should have been here in the first place and that's what I asked for.

Det. A: Okay. So you don't have an attorney on my charges.

DB: Oh. I need one.

Det A.: Okay. But that's what I'm saying. So you say you want to talk but you want your attorney here. I can't bring an attorney here right now 'cause you don't have an attorney.

Doc. 67 at 3–6. After this exchange, Mr. Briscoe decided to speak with the officers. *Id.* at 6. While the government claims that Mr. Briscoe received and understood his *Miranda* rights, it has failed to substantiate this claim with any evidence that Mr. Briscoe understood that he could assert his right to have an attorney present for the interview with Detective Acata and TFO Romero. The government's lack of evidence is especially troubling in light of the egregious nature of the violation. After Mr. Briscoe invoked his right to counsel and asked why he could not have an attorney present with him during the interrogation, Detective Acata said, "So you don't have an attorney on my charges." *Id.* She repeatedly told Mr. Briscoe that he did not have an attorney, that she could not bring an attorney to him, and that if he wanted to talk to her, he was not going to

13

have an attorney present. *Id.*  Like in *Lujan,* Detective Acata and TFO Romero began the interrogation by telling Mr. Briscoe that they were just there to get his side of the story and emphasized that it would be difficult to get an attorney in time for him to have one during the interrogation. *Id;* 734 F.3d at 921–22. In doing so, Detective Acata thus violated one of the Supreme Court's clearest strictures, namely that law enforcement must inform defendant that they have a "right to have an attorney present, not only at the outset of interrogation, but at all times." *Powell,* 559 U.S. at 62.

The government has thus failed to present any evidence to show that the nature of the questioning and the inadequate advisement of rights did not prevent Mr. Briscoe from knowingly and voluntarily waiving his rights. For this reason, the government has equally failed to meet its burden of establishing the voluntariness of Mr. Briscoe's confession. Accordingly, Mr. Briscoe's statements from September 18, 2020 are inadmissible for any purpose, including impeachment.

**III.    Mr. Briscoe's statements from his September 25, 2020 interview are admissible for impeachment purposes.**

Mr. Briscoe further contends that statements from his subsequent interview with FBI agents on September 25, 2020, during which the government agrees agents violated his right to counsel, should also be inadmissible for all purposes because the interview was tainted by his initial coerced interview on September 18, 2020. Doc. 67 at 12.  When a prior statement is involuntary, courts must look at "the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators" to determine whether the "coercion has carried over into the second confession." *Oregon v. Elstad,* 470 U.S. 298, 310 (1985). Here, a week elapsed between his initial interview and the second interview.  The first interview took place at DACCC, while the second interview took place at MDC.  The first interview was conducted by Detective Acata and TFO Romero, while the second interview was conducted by FBI Agents Acee and

Lopez-Recci and TFO Carreon. Doc. 67 at 6. There thus was a significant amount of time between confessions, a change in place of interrogations, and a change in identity of the interrogators. Based on these factors, the Court finds that the September 25, 2020 interview was not tainted by the September 18, 2020 interview. *See Lyons v. Oklahoma,* 322 U.S. 596, 604 (1944) (finding that a second confession was not tainted where the subsequent interrogation occurred twelve hours after the initial coerced confession and was conducted by different officers). Because his waiver was not factually involuntary or tainted by the prior coerced confession, the statements he made during that confession are admissible for impeachment purposes.

## CONCLUSION

For the reasons set forth above, the Court finds that Mr. Briscoe's statements from his interviews on September 18, 2020 are inadmissible for any purpose, including as substantive evidence and as impeachment evidence. The Court further finds that Mr. Briscoe's statements from his interview on September 25, 2020 are inadmissible as substantive evidence but are admissible for the purpose of impeachment.

**IT IS ORDERED** that Mr. Briscoe's Motion to Suppress [Doc. 67] is **GRANTED**, as follows: Mr. Briscoe's statements from September 18, 2020 may not be introduced as substantive evidence or as impeachment evidence, and Mr. Briscoe's statements from September 25, 2020 may not be introduced as substantive evidence but may be introduced as impeachment evidence.

_____
MARTHA VAZQUEZ
Senior United States District Judge

15